COUNTY OF TRAVERSE v. ST. PAUL, MINNEAPOLIS & MANITOBA RAILWAY COMPANY.

July 22, 1898.

Nos. 10,978—(36).

**Railway—Exemption of "First Division" from Taxation Appurtenant to Road and Transferable.**

The exemption of the road and land grant of the First Division of the St. Paul & Pacific Railway Company from ordinary taxation, in consideration of the payment to the state of a percentage of the gross earnings of its road (see First Division v. Parcher, 14 Minn. 224 [297]), was not a mere personal privilege to that company, but was appurtenant to the line of road and the lands, and transferable to any other company which might acquire the road and assume its operation; and the transfer of the road and land grant to such company did not amount to a sale of the lands, within the meaning of Laws 1857 (Ex. Sess.) c. 1, and Sp. Laws 1865, cc. 6, 9; following former decisions.

**Same—Benefits and Burdens Passed to Manitoba Company.**

This immunity, with its reciprocal burdens, passed to the St. P., M. & M. Ry. Co. by purchase on the foreclosure of a mortgage executed by the First Division Co. on its road, lands, franchises, immunities and exemptions.

**Same—Additional Grant of 1865 Included.**

This immunity applied to the "additional" congressional grant of March 3, 1865, as well as to the original grant of March 3, 1857.

**Lease to Great Northern not a Sale of Lands.**

A certain lease and contract between the St. P., M. & M. Ry. Co. and the G. N. Ry. Co. construed, and *held* not to constitute a sale of the lands, within the meaning of Sp. Laws 1865, cc. 6, 9.

73 M.—27

Proceedings in the district court for Traverse county to enforce payment of delinquent taxes. The defendant railway company duly filed objections to the enforcement of payment against the lands described. The cause was submitted to Powers, J., on a stipulation of facts, and he found in favor of defendant. Judgment was entered in pursuance of the findings, and the case was then certified to the supreme court. Affirmed.

*H. W. Childs,* Attorney General, and *F. J. Steidl,* for plaintiff.

The following may now be considered as rules established by the great weight of authority:

(1) The taxing power being a prerogative of government, its surrender or alienation will never be presumed or implied, but must be conferred in the clearest and most explicit terms. State v. Chicago, 89 Mo. 523; Kentucky v. Com., 87 Ky. 661; State v. Keokuk, 99 Mo. 30; Turnpike Cases, 92 Tenn. 369; Providence Bank v. Billings, 4 Pet. 514; State v. Bank, 95 Tenn. 221; Gillam v. Sioux City & St. P. R. Co., 26 Minn. 268; 3 Am. & Eng. Enc. 746, note 1.

(2) That tax exemptions granted without a consideration are not a contract, nor a franchise, but such grants belong to the same category of transactions which between individuals are designated as nude pacts, and may be revoked or repealed at the pleasure of the grantor. Rector v. County of Philadelphia, 24 How. 300; Tucker v. Ferguson, 22 Wall. 527; West W. Ry. Co. v. Board of Supervisors, 93 U. S. 595; Home Ins. Co. v. City Council, 93 U. S. 116.

(3) That immunity from taxation granted by the legislature is not a franchise, or attached to the land, but a personal privilege which can only be enjoyed by the person or corporation on whom conferred, and cannot be transferred by judicial or other sale, unless the intention of the legislature to make it assignable is clearly and explicitly expressed; and this immunity does not pass to the purchaser at judicial mortgage foreclosure, or other sale of the charter, property, rights, franchises, reservations, restrictions and liabilities of the corporation to whom granted. Kentucky v. Com., supra; State v. Chicago, supra; Bloxham v. Florida, 35 Fla. 625; State v.

Mercantile, 95 Tenn. 212; Nashville v. Com., 97 Ky. 162; Turnpike Cases, supra; Com. v. Nashville, 93 Ky. 430; Morgan v. Louisiana, 93 U. S. 217; Memphis & L. R. R. Co. v. Railroad Commrs., 112 U. S. 609; Chesapeake & O. Ry. Co. v. Miller, 114 U. S. 176; Louisville & N. R. Co. v. Palmes, 109 U. S. 244; Picard v. East Tenn., V. & G. R. Co., 130 U. S. 637; Wilmington & W. R. Co. v. Alsbrook, 146 U. S. 279; St. Louis & S. F. Ry. Co. v. Gill, 156 U. S. 649; St. Louis & S. F. Ry. Co. v. Stevenson, 156 U. S. 667, note.

The St. Paul & Pacific and the First Division companies did not have the power or authority to convey, by mortgage or otherwise, this immunity from taxation, and defendant did not acquire it by its purchases at the foreclosure sales. It has often been decided that a charter conferring upon a corporation all the rights, immunities, privileges and franchises enjoyed by another corporation does not confer upon it the exemption from taxation enjoyed by the latter. Kentucky v. Com., supra; Nashville v. Com., supra; State v. Mercantile, supra; Turnpike Cases, supra; Wilmington & W. R. Co. v. Alsbrook, supra.

As to the taxability of lands granted to the state as trustee by the act of congress of March 3, 1865, and claimed to have been granted by the state to the St. Paul & Pacific Railroad Company, the question has never been squarely before this court for adjudication. If this land was exempted, a new exemption was created of every odd-numbered section for four miles on each side of the railroad, without any new consideration, except the payment of a 3 per cent. gross-earnings tax, annually, which the company was already obliged to pay. Such exemption was therefore gratuitous, is not a franchise, nor appendant to the land, could not be assigned or transferred, came within the category of nude pact contracts, could be revoked or repealed at pleasure, and was clearly in conflict with Const. art. 9, §§ 1, 3, and art. 1, § 2. Le Duc v. City of Hastings, 39 Minn. 110; Northern Pac. R. Co. v. Walker, 47 Fed. 681; State v. Keokuk, supra; Files v. State, 48 Ark. 529; Bloxham v. Florida, supra; State v. Chicago, supra.

The contract or written instrument executed between defendant and the Great Northern Railway Company on February 1, 1890, while in the form of a lease for 999 years, is in fact an absolute sale

of all the railroads, railroad property and equipment of the defendant to the Great Northern Railway Company, and hence the lands are subject to taxation. For authorities that the transaction is a sale, see Com. v. Nashville, supra; State v. Winona & St. P. R. Co., 21 Minn. 472; St. Paul & C. R. Co. v. McDonald, 34 Minn. 195; County of Brown v. Winona & St. P. L. Co., 38 Minn. 397; Huck v. Chicago, 86 Ill. 352.

*M. D. Grover* and *Young & Lightner*, for defendant.

The acceptance by the predecessors of defendant of the charter exempting its lands from taxation, and containing a provision for a gross-earnings tax, constituted a contract based on a valuable consideration. A similar provision for a substituted mode of taxation has recently been held to effect, not an exemption from taxation, but the substitution of one method of taxation for another, and therefore not to be subject to the same rules of construction which obtain in the case of absolute gratuitous exemptions from taxation. McHenry v. Alford, 168 U. S. 651. See also City of St. Paul v. St. Paul & S. C. R. Co., 23 Minn. 469; First Division v. Parcher, 14 Minn. 224 (297); Chicago, M. & St. P. Ry. Co. v. Pfaender, 23 Minn. 217; County of Nobles v. Sioux City & St. P. R. Co., 26 Minn. 294; State v. Northern Pac. R. Co., 32 Minn. 294; State v. St. Paul, M. & M. Ry. Co., 30 Minn. 311; County of Hennepin v. St. Paul, M. & M. Ry. Co., 33 Minn. 534; County of Ramsey v. Chicago, M. & St. P. Ry. Co., 33 Minn. 537. As to the exemption contained in the increased grant of 1865, it has always been the doctrine of this court that such an act was a valid exercise of legislative power. State v. Winona & St. P. R. Co., 21 Minn. 315; City of St. Paul v. St. Paul & S. C. R. Co., supra; County of Stevens v. St. Paul, M. & M. Ry. Co., 36 Minn. 467; Huff v. Winona & St. P. R. Co., 11 Minn. 114 (180); Fitz v. Minnesota C. R. Co., 11 Minn. 304 (414); First Division v. Parcher, supra; Minnesota C. Ry. Co. v. Melvin, 21 Minn. 339.

The exemption of this land from ordinary taxation accompanied these lands when they passed into the hands of the defendant, the Manitoba Company. State v. Northern Pac. R. Co., supra; Chi-

cago, M. & St. P. Ry. Co. v. Pfaender, supra; County of Nobles v. Sioux City & St. P. R. Co., supra.

The question in this case turns on the construction of the state constitution and of territorial and state statutes establishing a policy for the taxation of land-grant railroad companies, which has subsisted during the whole period of the existence of Minnesota as a state. A long and uniform series of decisions has settled the construction of the constitution and these statutes, and established a rule of property. In such case, so far is the question from being in any way affected by the decisions of the United States supreme court on cases arising in other states, so far are those decisions from being in any way authoritative, should this question at any time be presented to that court, it would be the clear duty of that court, as it is of this, to adhere to and follow the construction which has been so fully settled in this court. Secombe v. Railroad Co., 23 Wall. 108.

The lease and contract between the Manitoba Company and the Great Northern Company did not subject the lands to ordinary taxation. That a lease for 999 years is not a sale is elementary. Morrison v. St. Paul & N. P. Ry. Co., 63 Minn. 75. Besides, in order to make the land subject to ordinary taxation, it is not enough that the railroads have been contracted to be sold or leased. The defendant might sell all its lines, and still the lands would not be subject to ordinary taxation in its hands. Minnesota C. Ry. Co. v. Melvin, supra; Minnesota C. Ry. Co. v. Donaldson, 38 Minn. 115.

MITCHELL, J.[1]

These proceedings were instituted to enforce taxes for 1894 against specific tracts of land belonging to the defendant, which constitute a part of the lands granted by the acts of congress of March 3, 1857,[2] and March 3, 1865,[3] to the territory or state of Minnesota, in trust to aid in the construction of certain lines of railroad. The particular tracts in question are part of the lands granted to the old Minnesota & Pacific Railroad Company, to aid in the construction of a line of road from St. Anthony to Breckenridge. The trial court has certified 12 questions to this court, but they may

[1] BUCK, J., did not vote.    [2] 11 Stat. 195.    [3] 13 Stat. 526.

all be summed up in one, viz.:   Are these lands, upon the facts, subject to taxation in the ordinary way?   The taxes having been levied prior to the passage of the so-called "Anderson Bill" (Laws 1895, c. 168), the case stands as if that act had never been passed. .

The history of the old territorial "land-grant" railroad companies, of the land-grant acts of congress, and of the legislation of Minnesota in execution of the trust thereby created, are matters of common knowledge in this state.   How the lands here in question were successively granted to the Minnesota & Pacific Railroad Company and the St. Paul & Pacific Company, and how, on the division of the latter, its main line, with all its lands, franchises, etc., became the property of the First Division Company are so fully stated in First Division v. Parcher, 14 Minn. 224 (297), commonly called the "Parcher case," that it need not be repeated, but merely supplemented by a statement of the following subsequent events.

By an act of congress passed March 3, 1865 (13 Stat. 526), the land grant of March 3, 1857, was increased from 6 to 10 sections per mile, and the "indemnity limits" were extended from 15 to 20 miles.   By Sp. Laws 1865, cc. 6, 9, this additional grant was given on the terms and conditions therein specified to the St. Paul & Pacific Railroad Company.   These two acts were accepted together and at the same time by that company.   The St. Paul & Pacific Railroad Company and the First Division Company executed mortgages or trust deeds purporting to convey and mortgage their lines of road, and all their lands, rights, franchises, immunities and exemptions, at any time possessed by said companies or by either of them; and by purchase, upon foreclosure of these mortgages or trust deeds in 1879, the St. Paul, Minneapolis & Manitoba Railway Company, a corporation organized under Laws 1876, c. 30 (G. S. 1894, § 2727), became the owner of all the railroads, property, granted lands, and all rights, franchises, privileges, immunities and exemptions at any time possessed by the mortgagor companies, or either of them, in so far as such rights, privileges, immunities and exemptions could be legally mortgaged, assigned or conveyed by said companies, or either of them, or acquired by purchase at such mortgage foreclosures or otherwise.

In February, 1890, the St. Paul, Minneapolis & Manitoba Railway

Company executed to the Great Northern Railway Company the lease and contract set out in the record. The lands in question still belong to the St. Paul, Minneapolis & Manitoba Railway Company, unless this lease and contract amounts to a sale thereof, within the meaning of the acts of 1865 already referred to. It does not appear whether the tracts of land against which the taxes are sought to be enforced were all included in the original grant of 1857, or whether part of them were acquired through the additional grant of 1865, and we shall assume that the list includes both classes of land. The defendant paid to the state 3 per cent. of the gross earnings of all its lines of road for the year 1894 and all prior years.

Counsel for the state concedes that, under the doctrine of the Parcher case, these lands, at least so far as included in the original congressional grant of 1857, were exempt from this form of taxation in the hands of the First Division Company. That case was decided 29 years ago, and has been repeatedly followed or recognized by this court as the law. It has become a law of property, and must be adhered to.

But the chief contention of the state is that this immunity of its road, lands, etc., from the ordinary form of taxation, was not a franchise or attached to the property, but a mere personal privilege to the First Division Company, which could not be transferred, by mortgage or otherwise, to any other company. And counsel has cited numerous authorities from other jurisdictions, and particularly from the supreme court of the United States, as supporting his contention. But we have in this state a body of law commencing over 40 years ago, made up of the acts of the legislature, the practical construction of these acts by the executive department of the government, and the judicial construction of them by our courts, which must control the decision of this question as applied to these old territorial "land-grant" railroad companies, without reference to the general doctrine or the decisions in other jurisdictions on the subject.

It is a part of the legislative history of Minnesota, both as a territory and a state, that its policy in regard to taxing land-grant roads was adopted with reference alike to facilitating the early construction of these lines of road, and to securing to the state what

was supposed an ultimate and adequate return for the value of the franchises conferred, and which would, in the long run, be the equivalent of the companies' fair share of taxation. The policy adopted was to provide for these companies paying to the state a certain percentage of their gross earnings in lieu of all other taxation on their railroads, and also on their granted lands until sold by the company; this latter being (unfortunately, as subsequent experience has proven) without limitation as to time. The object of this was not to grant a personal favor to the original companies, but to secure the construction of the lines of road. Hence, as might naturally be supposed, the history of legislation, as well as the decisions of this court, clearly indicate that the general understanding was that this system of taxation was not personal to the original company, but was to be alike applicable to any of their successors which might assume the completion of the road. The acts of the legislature on the subject, too numerous to be cited, all bear out this assertion.

The decisions of this court from the Parcher case down have all been to the effect that this exemption from ordinary taxation was not simply a personal privilege conferred upon the original company, but was appurtenant to the line of road, and existed in favor of any company which, in consideration of the land grant, should assume the construction and maintenance of the line by which it was applicable; that the immunity as well as the burden passed to any company which acquired the road, and assumed its operation and the performance of all the other duties which the original company owed to the public; that the transfer of the road and land grant to such a company did not constitute a sale of the lands, within the meaning of either the act of 1857 or of acts similar to those of 1865 already referred to. First Division v. Parcher, supra; State v. Winona & St. P. R. Co., 21 Minn. 315; Chicago, M. & St. P. Ry. Co. v. Pfaender, 23 Minn. 217; City of St. Paul v. St. Paul & S. C. R. Co., 23 Minn. 469; County of Nobles v. Sioux City & St. P. Ry. Co., 26 Minn. 294, 3 N. W. 701; State v. St. Paul, M. & M. Ry. Co., 30 Minn. 311, 15 N. W. 307; State v. Northern Pac. R. Co., 32 Minn. 294, 20 N. W. 234; County of Hennepin v. St. Paul, M. & M. Ry. Co., 33 Minn. 534, 24 N. W. 196; County of Ramsey v. Chi-

cago, M. & St. P. Ry. Co., 33 Minn. 537, 24 N. W. 313; County of Stevens v. St. Paul, M. & M. Ry. Co., 36 Minn. 467, 31 N. W. 942.

It has also been repeatedly held by this court, as well as by the supreme court of the United States, that the substitution of an assessment upon gross earnings in lieu of all other taxes on the road and the granted lands does not exempt the lands from taxation, but merely substitutes one method of taxation for another, upon the terms and conditions specified; and for that reason the latter court, which is very tenacious of the doctrine that an exemption from taxation must be clearly shown and strictly construed, has held that this doctrine does not apply, at least to its full extent, to such a case.    Northern Pac. R. Co. v. Clark, 153 U. S. 252, 14 Sup. Ct. 809; McHenry v. Alford, 168 U. S. 651, 18 Sup. Ct. 242.    And this court held to the same effect in City of St. Paul v. St. Paul & S. C. R. Co., supra.

In some of these cases the point decided was that any company owning and operating the road was liable to pay the 3 per cent. gross-earnings tax; but the converse of this must be true, inasmuch as this is a tax on the granted lands (until sold) as well as on the railroads; and, if the burden is appurtenant to the road, so must be the reciprocal benefit, the two being parts of a unit.    It will also be observed that, in some of the cases, the railway company which was a party to the suit was not one of those to whom the state granted the land, property and franchises of one of the original land-grant companies acquired by it under foreclosure of the mortgages executed to secure the state loan of credit in 1858.    At least two of the cases (21 Minn. 315; 36 Minn. 467, 31 N. W. 942) involved the taxation of lands embraced in the increased grant of 1865; and in neither of them, nor in any of the other cases cited, was it even suggested that there was any distinction, as to taxation, between such lands and those embraced in the original grant of 1857.    In fact, except as to lands outside of the 15-mile indemnity limits of the original grant, it would be impossible to distinguish between the two.    The whole was treated and adjusted as one grant.

But there can be no question but that the acts of 1865, already cited, include the increased as well as the original grant, and in terms apply the commuted system of taxation to the whole.    This

court has twice decided that the provisions of these acts exempting the roads and land-grant lands from ordinary taxation, in consideration of the payment of a percentage of the gross earnings of the road, were, as to the territorial land-grant companies, not in conflict with the provisions of the constitution relating to taxation. State v. Winona & St. P. R. Co., supra; City of St. Paul v. St. Paul & S. C. R. Co., supra. But it is immaterial whether these acts were or were not valid when originally enacted, for the reason that they were validated by the constitutional amendment of 1871 (State v. Luther, 56 Minn. 156, 57 N. W. 464); and it could not be claimed in any event that they were repealed or modified prior to the passage of the Anderson bill in 1895.

Whatever errors of law, if any, may be involved in the practical or judicial construction of either constitution or statutes on the subject of the taxation of "land-grant" lands of the old territorial railroad companies or their successors, after that construction has been adopted and acted upon by all departments of the government, and generally acquiesced in for so many years, it must now be adhered to. It is now too late to think of undoing the past. All these years the defendant has been paying, and the state accepting, taxes on these lands in the substituted or commuted form of a percentage of the gross earnings of the road. This was done for 1894, the very year for which the state is here seeking to enforce these taxes. The question whether the legislation on the subject involves the elements of a contract between the defendant or its predecessor and the state is not necessarily involved, and need not now be considered.

The lease and contract between the defendant and the Great Northern Railway Company is too long, and its provisions too numerous, to be discussed in full; but an examination of it satisfies us that it does not amount to a sale of either the road or the lands. That such is not the effect of a lease is elementary. Morrison v. St. Paul & N. P. Ry. Co., 63 Minn. 75, 65 N. W. 141. The strongest or most plausible argument urged to the contrary is that, although the lands are not in terms leased or sold or contracted to be, still the proceeds of sales are to go to pay the debts of the defendant which the Great Northern has agreed to pay. But the defendant remains

a debtor. The debts are still its debts, and it has a direct interest in paying them. In paying them with the proceeds of land sales, it is applying those proceeds to its own use. Moreover, the provision by which the Great Northern Railway Company agrees to pay these debts must be read in connection with the provisions by which the proceeds of these lands are to be applied towards their payment. The effect of the two, when taken together, is that the Great Northern Railway Company only agrees to pay such amount of defendant's debts as the proceeds of its lands shall be insufficient to pay.

Our conclusion is that the court below correctly decided that these lands were not subject to ordinary taxation in 1894, and that its judgment should be affirmed. It is so ordered.

CANTY, J. (dissenting).

I cannot concur in the foregoing opinion.

The Minnesota & Pacific Railroad Company was created by Laws 1857 (Ex. Sess.), c. 1, passed May 22, 1857. By section 16 of the act, certain lands granted to the state by congress to aid in the construction of railroads were granted to this company. Section 18 provided that the company should pay into the treasury of the territory 3 per cent. of its gross earnings "in lieu of all assessment whatever." It further provided:

"Said land granted by said act of congress hereby authorized to be conveyed to the said Minnesota & Pacific Railroad Company shall be exempt from all taxation till sold and conveyed by said company."

Shortly after the state constitution was adopted, it was amended. The amendment, adopted in April, 1858, authorized the state to issue accommodation bonds to this and the other land-grant railroad companies, to aid them in building their roads. The amendment provided that, before these bonds were issued to any one of these companies, it should give the state its bonds for a corresponding amount, secured by a deed of trust on its road, franchises and lands, to indemnify the state against loss, and, on default in the payment by the company of interest on the state bonds delivered to

the company, and sold by it, the governor could foreclose the mortgage, and sell all of the property and franchises so mortgaged.

Pursuant thereto, state bonds were issued to the Minnesota & Pacific Railroad Company, which it sold. It gave the state the mortgage provided for to indemnify it against loss. The company made default in the payment of the interest on the state bonds issued to it. The governor foreclosed the mortgage given by it to the state, and bid in, in the name of the state, the property and franchises so mortgaged. The company had failed to complete any part of its road, or earn any part of its grant. By the act of March 10, 1862, the legislature granted all of the rights so mortgaged to the state, and bid in by it, to the St. Paul & Pacific Railroad Company, which the act proceeded to create and organize. From this company sprung the First Division Company.

A full history of these matters is given in the Parcher case, in which it is held that the property, rights, franchises and immunities of the Minnesota & Pacific Railroad Company, so sold on the foreclosure sale, and bid in by the state, did not merge in the state. Sections 1 and 3 of article 9 of the constitution provided then, and still provide, that all property (except certain specified exemptions) shall be taxed; that taxation shall be uniform; and that property on which taxes are to be levied shall have a cash valuation. Under these provisions, the state legislature could not grant immunity from taxation. State v. Stearns, 72 Minn. 200, 75 N. W. 210. But it was held in the Parcher case that the immunity from taxation so granted by the territory, and which reverted to the state at the foreclosure sale, did not merge in the state, but could be again granted by the state in connection with the lands to which it had been attached, notwithstanding said constitutional provision regarding uniformity of taxation. Whether this is good law or not, it has become a rule of property, and, as such, must be respected.

It was also held in the Parcher case that the sale to the state on the foreclosure, and the resale by the state to the St. Paul & Pacific Railroad Company, were not sales, within the last clause of said section 18 of the act of May 22, 1857. That clause exempts the granted lands from taxation "till sold and conveyed." I am clearly of the opinion that, ordinarily, land sold on foreclosure would,

when the sale was completed, be "sold and conveyed," within the meaning of that clause, so that the exemption from taxation would terminate as to such lands. But, while the decision in the Parcher case has been much questioned, I am not prepared to say that it is not correct so far as that point is concerned. The Minnesota & Pacific Railroad Company never earned the lands, and, in fact, the state did not bid them in. It merely bid in the right to earn these lands. True, there is a legal fiction that the legal title passes on such a grant, subject to be forfeited on failure to perform. But that is only a fiction. That immunity was given, not to encourage the taking of that fictitious title, but to encourage the earning of the right to the lands. All that the Minnesota & Pacific Railroad Company ever got was the right to earn these lands. But it never did earn them. It may well be held that the legislature never intended to limit the immunity from taxation on the sale of that right, so as to have that immunity terminate before it really ever began. This is all that was held in the Parcher case, and all that was before the court for consideration at that time.

The case of County of Nobles v. Sioux City & St. P. R. Co., 26 Minn. 294, 3 N. W. 701, follows the Parcher case, and makes this point plain, as will be seen from the following quotation from the opinion (page 298):

"All the acts of the legislature, from first to last, show it was intended that this exemption should exist in favor of any company which, in consideration of the land grant, should assume the construction and maintenance of the line to which it was applicable. It is so expressed in the act of May 22, 1857, in respect to the Root River Valley & Southern Minnesota Company, and in the act of March 4, 1864, in respect to the Minnesota Valley Company; and in the act of 1869 the authority given to the latter company to transfer to the Sioux City & St. Paul Company, not the lands merely, but 'so much of the line and *land grant*,' implies that the company so authorized might pass to the other all the benefits, together with the burdens, of the grant of land made by the state. Although the act making the grant operated as a grant in præsenti so far as vesting the nominal legal title, it did not pass an absolute, unconditional title. The title was liable to be defeated by the failure of the company to comply with the conditions annexed to the grant. The absolute, unconditional title was to be earned by construction of road. The grant to the company mentioned in the act

of 1857, and the transfer of that grant, by the act of 1864, to the Minnesota Valley Company, vested, it is true, the naked legal title; but the substantial right vested was the right to earn the lands by construction of road. This is what the agreement under the act of 1869 passed to the Sioux City & St. Paul Company; that is, the right to construct and maintain the part of the line west of St. James, and to earn the lands applicable to that part of the line. That act authorized this to be done."

But there is also another reason why it might well be held that the mortgage of these lands to the state, the sale to the state on the foreclosure, and the sale by the state to the St. Paul & Pacific Railroad Company, did not terminate the exemption under said clause in the original grant, which exempted the lands from taxation "till sold and conveyed." Under the provisions in our constitution requiring equality and uniformity of taxation, the legislature could not remove or extend this limitation on the exemption of these lands from taxation (see State v. Stearns, supra); but the people could do so by an amendment to the constitution. The constitutional amendment of 1858 authorized these lands to be mortgaged to the state, and authorized the governor to foreclose the mortgage "in such a manner as may be prescribed by law." Laws 1860, c. 82, authorized the governor to foreclose the mortgage and bid in the lands in the name of the state. Then the constitutional amendment, and the law passed pursuant to it, authorized the lands to be mortgaged to the state, to be sold on foreclosure, to be bid in by the state; and as it was not contemplated that the state should retain the lands, and proceed to build the roads, it was implied that the state should again convey the lands to whoever should build them. Then, by consenting in a constitutional manner to all of these transactions, the state has waived the effect which they might otherwise have had in terminating the exemption of these lands from taxation. This court so held in State v. Winona & St. P. R. Co., 21 Minn. 315, where it is said, at page 318:

"In other words, the constitutional amendment, popularly known as the Five Million Loan Amendment, is controlling in reference to its subject. It is not a mere act of the legislature, but a part of the organic and fundamental law, of equal authority, per se, with any other part of the constitution. Being a particular provision,

with reference to a particular subject-matter, it is, within its own sphere, so far as that subject-matter is concerned, paramount and supreme. And it follows that its effect in permitting the state, by the foreclosure or forfeiture, to acquire, hold and transfer the immunity from taxation, according to the doctrine of the Parcher case, is not controlled or overridden by the general constitutional provision in regard to taxation before quoted."

But it does not follow from what has been said that the state has wholly waived or destroyed the condition found at the end of said section 18, or has waived it as applied to all future mortgage and foreclosure sales. These lands were again mortgaged, were again sold on foreclosure sale in 1879, and, according to the stipulation made in the court below, were purchased at that sale by the Manitoba Company. Did this, by the terms of the original charter, terminate the exemption from taxation? It does not appear from the record whether or not the lands were then earned. But the burden was on respondent to show that its lands were exempt from taxation; and, if the fact that the lands were earned prior to that sale would render them liable to taxation, respondent must show that they were not then earned. This it has not done. Then, we may assume that the First Division Company earned these lands by building its line of road prior to the foreclosure sale in 1879.

Exemptions from taxation, whether by grant or otherwise, are strictly construed. Cooley, Taxn. (2d Ed.) 205. See also Pine Co. v. Tozer, 56 Minn. 288, 57 N. W. 796. Of course, this rule does not apply to land that is being used in connection with the operation of the railroad, where the railway company is paying a commuted tax in the form of a percentage of its earnings, or to land that contributes to such earnings; as that would be construing the law or contract strongly in favor of double taxation. However, in construing this very question of commuted taxation, this court, in Chicago, M. & St. P. Ry. Co. v. Pfaender, 23 Minn. 217, said, at page 222:

"Whenever privileges and franchises are granted to a corporation in matters concerning and affecting public interests, such as an exemption from taxation, a strict construction against the corporation, and favorable to the public, must be adopted, in case the stat-

ute containing the grant gives rise to any reasonable doubt or uncertainty as to its meaning, by reason of its ambiguity or otherwise."

But the land here in question does not contribute in any manner to the gross earnings of the road, and the most that can be asked is that the above-quoted clause, at the end of section 18 of the law of 1857, be given a fair construction.   There ought not to be any doubt that a sale under a mortgage foreclosure is a sale and conveyance, within the meaning of said clause.   Then, by the very terms of the grant of immunity from taxation, that immunity has expired.

To sustain its position, the majority cite a long line of the decisions of this court; but in none of those decisions was the question here presented before the court.   It might have been presented in County of Stevens v. St. Paul, M. & M. Ry. Co., 36 Minn. 467, 31 N. W. 942, if it were not for the fact that, in the trial of that case in the court below, the parties expressly stipulated that, on said foreclosure sale of 1879, the Manitoba Company succeeded to all the immunities, exemptions and privileges, including the exemption from ordinary taxation, at any time possessed by the First Division Company, the St. Paul & Pacific Railroad Company and the Minnesota & Pacific Company.   In State v. Northern Pac. R. Co., 32 Minn. 294, 20 N. W. 234, there is a dictum to the effect that the exemption from taxation is appurtenant to the line of road; but no such question was before the court, and we must assume that the question here under consideration was not in the mind of the court at all at that time.   The Northern Pacific Railroad Company had, by lease, acquired a right to run its trains over a portion of the road of the Manitoba Company.   Both companies were bound to pay the 3 per cent. gross-earnings tax; and the only question in the case was whether either of them could evade it by running their trains over one road, instead of running them over two parallel roads, one owned by each.

But the question here is not whether this land grant is appurtenant to the road.   If the company had sold its road, retained its lands, and the state attempted to tax its lands under the general tax law, that question, or at least one phase of it, would arise. Then it may be seen how little the doctrine in that case has to do

with this case. The question here is not merely whether this immunity from taxation is a personal privilege. The question is much stronger. It is whether said condition at the end of said section 18 means anything, or whether it shall be brushed away with a few glittering generalities.

In order to realize how erroneous is the position of the majority in extending the doctrine of the Parcher case so as to cover this case, we should consider what the other courts of the country hold. The case of Morgan v. Louisiana, 93 U. S. 217, is summed up in its syllabus as follows:

"Upon a sale of the property and franchises of a railroad corporation under a decree founded upon a mortgage which in terms covers the franchises, or under a process upon a money judgment against the company, immunity from taxation upon the property of the company provided in the act of incorporation does not accompany the property in its transfer to the purchaser. The immunity from taxation in such cases is a personal privilege of the company, and not transferable."

The case of Memphis & L. R. Co. v. Railroad Commrs., 112 U. S. 609, 5 Sup. Ct. 299, so far as here material, is also summed up in the following extracts from the syllabus:

"A statute exempting a corporation from taxation confers the privilege only on the corporation specially referred to, and the right will not pass to its successor unless the intent of the statute to that effect is clear and express.  *  *  *  A mortgage of the charter of a corporation, made in the exercise of a power given by statute, confers no right upon purchasers at a foreclosure sale to exist as the same corporation. If it confers any right of corporate existence upon them, it is only a right to reorganize as a corporation, subject to laws, constitutional and otherwise, existing at the time of the reorganization."

See, also, Chesapeake & O. Ry. Co. v. Miller, 114 U. S. 176, 5 Sup. Ct. 813; St. Louis & S. F. Ry. Co. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484; Norfolk & W. R. Co. v. Pendleton, 156 U. S. 667, 15 Sup. Ct. 413; Kentucky v. Com., 87 Ky. 661, 10 S. W. 269; State v. Chicago, 89 Mo. 523, 14 S. W. 522. There are many more cases to the same effect. In fact, this is now the almost universal holding outside of this state. Under the doctrine of these cases, the land here in question would now be subject to general taxation, even if the im-

73 M.—28

munity from taxation in the grant had been perpetual, and the grant contained no such condition terminating the exemption when the land is sold.

But out of respect to the Parcher case, and the other cases explaining it and the rule of property resulting therefrom, I do not stand on the doctrine that such an immunity from taxation is a personal privilege, as strong as that doctrine is. I stand on a still stronger doctrine, which is that the condition on which this immunity from taxation was limited has happened, and the immunity has expired. As I have shown, that point is not covered by the Parcher case.